UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
ALL AMERICAN ATM, Corp.

**'07 CIV 11204**

CIV. ACT. No.:

**JUDGE ROBINSON**

Plaintiff,

COMPLAINT

Jury Trial
Demanded

-against-

FINANCIAL EQUIPMENT AND DATA CORP.,

Defendant.
----------------------------------------------------------------x

    The plaintiff, ALL AMERICAN ATM CORP. (hereinafter referred to as "AAA") by its attorneys, the Law Offices of Timothy G. Griffin, as and for its complaint against the defendants, Financial Equipment and Data Corp. (hereinafter referred to as "FED CORP") respectfully alleges as follows upon information and belief:

1. That at all times hereinafter mentioned AAA was a corporation in good standing organized under the laws of the State of New York with a principal place of business at located in Westchester County.

2. That at all times hereinafter mentioned, upon information and belief, FED CORP was a foreign corporation organized under the laws of the State of Alabama authorized to do business within the State of New York.

*FACTS COMMON TO ALL ALLEGATIONS*

3. AAA is a privately owned company engaged in the providing of automatic teller machine (hereinafter "ATM Services") services throughout the United States.

4. FED CORP is an independent sales organization which processed electronically the ATM Services on behalf of AAA.

5. In connection with the processing of said ATM Services, FED CORP was obligated to accurately and promptly process automatic teller machine transactions. In connection with the processing of these ATM Services, FED CORP was obligated to debit and credit the accounts of customers of AAA and/or AAA in connection with the ATM services which were performed at the various AAA automatic teller machines.

## JURISDICTION AND VENUE

5. This Court has jurisdiction of the within Count under 28 U.S.C. 1332. This action is of a civil nature involving, exclusive of interests and costs, a sum in excess of $100,000.00. Every issue of law and fact herein is wholly between citizens of different states.

## FACTS COMMON TO ALL COUNTS

6.. In the late 1970s, bank consortiums formed numerous regional electronic funds transfer ("EFT") networks to enable their customers to withdraw funds from ATMs owned by a variety of different banks. The EFT networks were first used to handle PIN debit purchases at retailers in the early 1980s. It was not until the mid-1990s, however, that PIN debit became a popular method of payment for consumers to purchase goods and services at retail stores.

7. Many EFT networks, including route both ATM and PIN debit transactions. Some companies, however, operate separate ATM and PIN debit networks. For example,

while Interlink is Visa's PIN debit network, Visa operates a separate ATM network called Plus.

8. A PIN debit network serves as the critical electronic switch connecting a network's participating financial institutions with merchants that accept the network. PIN debit networks provide one of the primary means for consumers to access the money in their checking accounts.

9. A PIN debit network also performs a number of related functions necessary for the efficient operation of the network. For example, PIN debit networks: promote their brand names among consumers, merchants, and banks; establish rules and standards to govern their networks; and set fees and assessments for use of the network's products and services. Collectively, these products and services are "PIN debit network services."

10. To execute a PIN debit transaction, a customer swipes a debit card at a POS terminal and enters a PIN on a numeric keypad. After the PIN is entered, the POS terminal transmits the transaction and bank card information to a "merchant processor," which acts as a conduit between the merchant and the various PIN debit networks. The merchant processor sends the information to the appropriate PIN debit network, which switches the transaction to the issuing bank's "card processor."

11. The card processor accesses the bank's account database to verify the PIN and ensure that the customer has sufficient funds to pay for the purchase. The card processor sends an electronic message to the PIN debit network accepting or rejecting the

transaction. The PIN debit network switches this reply back to the merchant through the merchant processor to complete the transaction. The entire authorization process takes place electronically in just seconds. At the same time, the merchant acquirer "purchases" the transaction from the merchant, guaranteeing payment and facilitating settlement of the transaction.

12. A transaction can only be routed over a particular PIN debit network if the customer's bank issues a debit card that participates in that network. This participation is signified by placing the network's logo, or "bug," on the card.

13. To provide their customers with seamless access to the widest array of merchants, a significant number of banks place the bug of more than one PIN debit network on their cards. Many networks, including NYCE, have a "priority routing" rule that allows the card issuer to designate which PIN debit network will serve as the primary network for PIN debit transactions when the bank bugs its cards with two or more networks. STAR, by contrast, imposes a network routing rule, requiring most transactions on cards bearing the STAR bug to be routed over the STAR network, regardless of whether there are other bugs on the card.

14. PIN debit networks charge both the merchant and the card-issuing bank a "switch" fee for the network switching services provided by the network. This fee typically ranges from 2 cents to 4 cents per transaction. The PIN debit networks also set an "interchange" fee, which is a fee paid by the merchant to the PIN debit network. The PIN debit network then passes through the interchange fee to the card-issuing bank as compensation for permitting access to the consumer's bank account.

15. The interchange fee is normally at least 4-5 times as large as the switch fee, ranging from as low as 10 cents to as high as 45 cents, depending on the network, the merchant, and the size of the transaction. Consequently, the merchant's total charge for each PIN debit transaction is the interchange fee plus the switch fee.

16. The PIN debit network services market is characterized by significant network effects. Financial institutions are more likely to join networks that are accepted by many merchants. Conversely, merchants are more likely to accept networks that have many large financial institutions as members because the value of a particular PIN debit network depends in great measure on the breadth of its acceptance and use.

17. Many debit cards can also execute "signature" debit transactions, in addition to PIN debit transactions. Signature debit transactions are authenticated like credit card transactions, with the customer signing for identification rather than entering a PIN. Visa and MasterCard developed the only two signature debit networks from their existing credit card infrastructure. In contrast to a PIN debit transaction, in which the funds are immediately transferred from the customer's account, a signature debit transaction generally takes twenty-four to forty-eight hours to settle.

18. ATM work in a different manner. When a cardholder wants to do an ATM transaction, he or she provides the necessary information by means of the card reader and keypad.

19. The ATM forwards this information to the host processor, which routes the transaction request to the cardholder's bank or the institution that issued the card. If

the cardholder is requesting cash, the host processor causes an electronic funds transfer to take place from the customer's bank account to the host processor's account. Once the funds are transferred to the host processor's bank account, the processor sends an approval code to the ATM authorizing the machine to dispense the cash.

20. The processor then ACHs (ACH" is short for "automated clearing house.") the cardholder's funds into the merchant's bank account, usually the next bank business day. In this way, the merchant is reimbursed for all funds dispensed by the ATM. The ACH means that a person or business is authorizing another person or business to draft on an account. It is businesses to ACH a monthly membership fee from member accounts, and many small businesses use ACH for direct deposit the cardholder's funds into the merchant's bank account, usually the next bank business day. In this way, the merchant is reimbursed for all funds dispensed by the ATM.

21. The defendant FED CORP processed transactions on behalf of the Plaintiff AAA.

22. In connection with the processing of these transactions the defendant Fed Corp was obligated to properly credit the transactions processed though AAA's ATM terminals and customers.

23. Fed Corp failed to properly credit these transactions to AAA's terminals and customers. As a result of the failure to properly credit the ATM Transactions, AAA was forced to cover the amounts that Fed Corp. failed to credit to the ATM terminals and customers.

24. As a result thereof, AAA has been damaged by the acts of the defendant Fed Corp.

## AS AND FOR A
## FIRST COUNT
(Fraudulent Inducement)

25. Plaintiff reallege each of the allegations set forth in paragraphs numbered One (1) through TWENTY-FOUR (24) as if set forth herein at length.

26. As a result of the representations made by the defendant and its representatives to the Plaintiff, the defendant fraudulently induced the Plaintiff engage defendant as its ISO.

27. In connection with said representations, Plaintiff remained in the a customer of the defendant to their detriment.

28. The representations made to the Plaintiff were false and known to be false by the defendant.

## AS AND FOR A SECOND
## COUNT
## FOR AN ACCOUNTING

29. Plaintiff repeat, reiterate and reallege each and every allegation contained in paragraphs one (1) through Twenty-Eight (28) as if more fully set forth herein.

30. Plaintiff was a beneficiary of the contract with the defendant, Fed Corp.

31. Upon information and belief, the defendant failed to properly credit the accounts of AAA and it customers.

33. Plaintiff is entitled to an account of the operation of the business of Fed Corp the adjustments made to the financial relationships between the defendant, Fed Corp and the plaintiff, AAA.

## THIRD COUNT
## FOR A
## BREACH OF CONTRACT

34. Plaintiff repeat, reiterate and reallege each and every allegation contained in paragraphs one (1) through thirty-three (33) as if more fully set forth herein.

36. Fed Corp, wrongful refusal abide by the terms an conditions of the agreement between Fed Corp and AAA as described in this complaint is a breach of the contract.

37. Plaintiff, AAA requested that the defendant FED Corp correct its failure to abide by the terms of the agreement and properly credit the accounts of AAA and its customers, however, the defendant Fed Corp. refused to correct its conduct.

WHEREFORE, Plaintiff All American ATM Corp demands judgment as follows:

a. compensatory damages;

b. consequential and incidental damages;

c. punitive damages;

d. interest;

e. such equitable and injunctive relief as may be appropriate;

    f.    such costs, expenses and attorney's fees as are allowable at law or by Rule;

    g.    an accounting of the financial dealings between Fed Corp and the All American ATM Corp.; and

    g.    such further relief as the Court deems equitable, appropriate and just.

Dated:    Bronxville, New York
September 13, 2007

Yours, etc.,

Law Offices of Timothy G. Griffin

By: _____
Timothy G. Griffin (TG-0564)
77 Pondfield Road
Bronxville, New York 10708
(914) 771-6754